**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CAITLIN DARR, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>THE GATORADE COMPANY and PEPSICO, INC.<br><br>        Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Case No. 1:26-cv-6075 |

Plaintiff Caitlin Darr, individually and on behalf of all others similarly situated, brings this class action suit for damages and equitable relief against The Gatorade Company and PepsiCo, Inc. ("Defendants"). Plaintiff alleges the following based upon personal information as to allegations regarding themself, and the investigation of their counsel, and on information and belief as to all other allegations:

**TABLE OF CONTENTS**

NATURE OF THE ACTION ...............................................................................................1

THE PARTIES....................................................................................................................3

JURISDICTION AND VENUE ..........................................................................................4

FACTUAL ALLEGATIONS ..............................................................................................5

      A.      Defendants Market the Products as Free of Artificial Flavors ................................5

      B.      The Citric Acid in the Products Is Manufactured, Not Naturally Derived ............14

      C.      The Products Contain Artificial Flavors Contrary to Defendants' Claims............25

      D.      These Misrepresentations Are Material to Consumers...........................................30

CLASS ACTION ALLEGATIONS ...................................................................................32

FIRST CAUSE OF ACTION ...........................................................................................37

SECOND CAUSE OF ACTION .......................................................................................39

THIRD CAUSE OF ACTION ..........................................................................................41

FOURTH CAUSE OF ACTION .......................................................................................43

FIFTH CAUSE OF ACTION ...........................................................................................45

SIXTH CAUSE OF ACTION ...........................................................................................46

PRAYER FOR RELIEF ...................................................................................................47

## NATURE OF THE ACTION

1.      In March 2026, Defendants announced "Lower Sugar" Gatorade, a product they billed as "a new era of hydration with no artificial flavors, sweeteners or colors[.]"

2.      Defendants manufacture, market, and sell "Lower Sugar" Gatorade in several flavors, including, as relevant here, Glacier Cherry, Rain Berry, Lemonade, and Fruit Punch (collectively, "the Products," as shown below).

 

- 1 -

 

3.      Defendants prominently market the Products as containing "No Artificial Flavors" and being "Naturally Flavored" or "Naturally Flavored with Other Natural Flavors." These claims appear on the Products' front labels and across channels through which Defendants sell and market them.

4.      These representations are both false and misleading. Today, ninety percent or more of all commercial citric acid is not naturally produced from citrus fruits but, instead, is artificial citric acid that is synthetically derived from a form of black mold, *Aspergillus niger*. Upon information and belief, given the volume of Products sold by Defendants, it is not possible that the Products are made without artificial citric acid. In addition, the Products contain sodium citrate,

an artificial ingredient that imparts flavor, specifically tartness. Defendants' false and misleading statements conceal these facts.

5.     Defendants' false and misleading statements caused Plaintiff and members of the proposed classes to pay a price premium for the Products. Had they known the truth, Plaintiff and members of the proposed classes would not have purchased the Products or would have paid less.

6.     Plaintiff seeks monetary and injunctive relief against Defendants for violating the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; other states' consumer fraud statutes; and the common-law prohibitions on unjust enrichment and fraud.

## THE PARTIES

7.     Plaintiff Caitlin Darr is a California resident. They have purchased the Products from Albertsons and Vons, most recently in May 2026. Plaintiff relied on Defendants' representations that the Products contained "No Artificial Flavors" and were "Naturally Flavored with Other Natural Flavors" and would not have purchased the Products, or would have paid less, had they known the truth.

8.     Defendant The Gatorade Company is a Delaware corporation and is headquartered in Chicago, Illinois. Defendant The Gatorade Company is a subsidiary of Defendant PepsiCo, Inc.

9.     Defendant PepsiCo, Inc. is a North Carolina corporation and is headquartered in Purchase, New York. Defendant PepsiCo's "products are enjoyed by consumers more than one billion times a day in more than 200 countries and territories around the world," generating "nearly

$92 billion in net revenue in 2024, driven by a complementary beverage and convenient foods portfolio that includes . . . Gatorade[.]"[1]

10.     Defendants own, manufacture, and market the Gatorade brand, including the Products at issue in this action. Their Gatorade brand takes 61.6% of the sports drink market share,[2] and the Products are, as of today's date, the #13 best-selling sports drink on Amazon.[3]

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

12.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 Class members are involved; and many members of the proposed Classes are citizens of different states than Defendants.

13.     This Court has personal jurisdiction over Defendants because Defendant The Gatorade Company is headquartered in Chicago, Illinois, and Defendants committed the tortious acts alleged herein in Illinois, regularly conduct business in this District, and have extensive contacts with this forum.

---

[1] *About Us*, PEPSICO, *available at* https://contact.pepsico.com/gatorade/about-us (last accessed May 22, 2026).

[2] Rachel Arthur, *Gatorade, Powerade and Bodyarmor: Market data reveals how the top trio shape the US sports drink category*, BEVERAGE DAILY (2026), https://www.beveragedaily.com/Article/2025/02/26/gatorade-powerade-bodyarmor-how-coca-cola-pepsico-shape-sports-drinks/.

[3] *Best Sellers in Sports Drinks*, AMAZON, *available at* https://www.amazon.com/gp/bestsellers/grocery/16318371/ref=pd_zg_hrsr_grocery (last accessed May 22, 2026).

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant The Gatorade Company resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendants transact substantial business in this District.

## FACTUAL ALLEGATIONS

### A. Defendants Market the Products as Free of Artificial Flavors

15. Reasonable consumers understand the phrase "artificial flavor" in its ordinary, everyday sense: artificial, meaning something created by humans but "made . . . to seem like something natural,"[4] and flavor meaning "affect[ing] the sense of taste."[5]

16. In March 2026, Defendants announced the launch of the Products and "a new era of hydration with no artificial flavors, sweeteners or colors," targeted at "active consumers."[6]

17. Defendants prominently market the Products as containing "No Artificial Flavors," including on their front labels:

---

[4] *Artificial*, MERRIAM-WEBSTER, *available at* https://www.merriam-webster.com/dictionary/artificial (last accessed May 22, 2026).

[5] *Flavor*, MERRIAM-WEBSTER, *available at* https://www.merriam-webster.com/dictionary/flavor (last accessed May 22, 2026).

[6] *Gatorade Lower Sugar brings a new era of hydration with no artificial flavors, sweeteners or colors and 75% less sugar than Gatorade Thirst Quencher*, PEPSICO (2026), https://www.pepsico.com/newsroom/press-releases/2026/gatorade-lower-sugar-brings-a-new-era-of-hydration-with-no-artificial-flavors-sweeteners-or-colors.




 

18.     On three of the Products, Defendants label them "Naturally Flavored with Other Natural Flavors." On the fourth, Fruit Punch, simply "Naturally Flavored."[7]

19.     Defendants reinforce these labels by placing realistic fruit images directly alongside the "No Artificial Flavors" and "Naturally Flavored" claims—cherries on Glacier Cherry, blackberries on Rain Berry, lemons on Lemonade, and an orange and grapefruit on Fruit Punch.

20.     When sold in multipacks, the same claims appear on the extra packaging.

---

[7] Unless otherwise noted, "Naturally Flavored" and "Naturally Flavored with Other Natural Flavors" are referred to collectively herein as "Naturally Flavored."





[8] *Gatorade Lower Sugar Electrolyte Sport Drink Fruit Punch - 6-20 Fl. Oz*., ACME MARKETS, *available at* https://www.acmemarkets.com/shop/product-details.971363332.html?productId=971363332&CMPID (last accessed May 22, 2026).

[9] *Gatorade Lower Sugar, Variety Pack, 12 fl oz, 24-count*, COSTCO, *available at* https://www.costco.com/p/-/gatorade-lower-sugar-variety-pack-12-fl-oz-24-count/4000439916?langId=-1 (last accessed May 22, 2026).

21. Defendants' "No Artificial" marketing extends beyond the label. Their digital campaign—spanning TV, in-app, and paid social media advertising—repeats the same message.

22. In Defendants' flagship ad featuring Caitlin Clark and Candace Parker, Parker narrates: "Introducing Gatorade Lower Sugar. No Artificial Colors, **No Artificial Flavors,** No Artificial Sweeteners, and 75% less sugar. Gatorade Lower Sugar hydrates better than water. Is it in you?"[10] (emphasis added) The ad includes the following slides:



---

[10] *Introducing Gatorade Lower Sugar: No Artificial Flavors, Sweeteners, or Colors*, GATORADE (2026), https://www.youtube.com/watch?v=iZjpjBxSHg4.



23.     Defendants carry the "No Artificial" campaign onto every third-party retail platform where they sell the Products.

24.     On Walmart, Defendants name the Products "Gatorade Lower Sugar, No Artificials" and repeat "No Artificial Flavors" and "Naturally Flavored" in scrollable graphics.[11]

---

[11] *Gatorade Lower Sugar, No Artificials Rain Berry Flavored Electrolyte Sports Drink, 28 fl oz, 75% Less Sugar, Hydration*, WALMART, *available at* https://www.walmart.com/ip/Gatorade-Lower-Sugar-Thirst-Quencher-Glacier-Cherry-28-Fl-Oz/19002252689 (last accessed May 22, 2026).






25.     The same graphics appear across all Product flavors and Defendants' other third-party retail pages, including but not limited to Amazon and Target.

26.     On both Amazon and Target, Defendants also use the following graphic:



27.     On Amazon, Defendants embed the claim in the Product name itself, in the product description, and in their FAQ. Asked, "Does this drink contain artificial colors?" Defendants answer: "No — Gatorade Lower Sugar does not contain artificial flavors, sweeteners, or colors."[13]

28.     Defendants go further still. Under "Special Ingredients," a field consumers reasonably understand to reflect the product's actual composition, Defendants list: "No Artificial Flavors, Sweeteners, or Colors from Artificial Sources."[14]

29.     If a consumer were to research the Products independently, they would not find a different answer. On gatorade.com, Defendants prominently display the "No Artificial" claim.

---

[12] *Gatorade Lower Sugar Electrolyte Sports Drink, Rain Berry, 20 fl oz Bottles, (6 Pack), 75% Less Sugar, No Artificial Flavors, No Artificial Sweeteners, No Artificial Colors, Hydration*, AMAZON, *available at* https://www.amazon.com/Gatorade-Electrolyte-Artificial-Sweeteners-Hydration/dp/B0GJG5DX8J?th=1 (last accessed May 22, 2026); *see also Gatorade Lower Sugar Lemonade Sports Drink - 12pk/12 fl oz Bottles*, TARGET, *available at* https://www.target.com/p/gatorade-lower-sugar-lemonade-sports-drink-12pk-12-fl-oz-bottles/-/A-94855578#lnk=sametab (last accessed May 22, 2026).

[13] *Gatorade Lower Sugar Electrolyte Sports Drink, Rain Berry, 20 fl oz Bottles, (6 Pack), 75% Less Sugar, No Artificial Flavors, No Artificial Sweeteners, No Artificial Colors, Hydration*, AMAZON, *available at* https://www.amazon.com/Gatorade-Electrolyte-Artificial-Sweeteners-Hydration/dp/B0GJG5DX8J?th=1 (last accessed May 22, 2026).

[14] *Id.*



30. Under "Product Details," Defendants state the Products contain "no artificial flavors, sweeteners or colors from artificial sources."[16]

31. Defendants' FAQ says the same. Asked to compare their products, Defendants state: "G2 is a lower-sugar version of Gatorade Thirst Quencher, but it contains artificial flavors and colors from artificial sources. Gatorade Zero contains zero sugar and uses artificial sweeteners. Gatorade Lower Sugar contains 75% less sugar than Gatorade Thirst Quencher and is **made without artificial flavors**, artificial sweeteners, or colors from artificial sources" (emphasis added).[17] Defendants built their new product's entire market position on the lack of artificiality.

---

[15] *Gatorade Lower Sugar Fruit Punch*, GATORADE, *available at* https://www.gatorade.com/sports-drinks/gatorade-lower-sugar/fruit-punch-00052000067750 (last accessed May 22, 2026).

[16] *Id.*

[17] *Id.*

- 13 -

32.     Similarly, on Facebook, Defendants' launch post reads simply: "Introducing Gatorade Lower Sugar. No artificial flavors, sweeteners, or colors."[18] On YouTube, the defining Caitlin Clark ad runs under the title "Introducing Gatorade Lower Sugar: No Artificial Flavors, Sweeteners, or Colors."[19]

33.     The "No Artificial" marketing campaign is widespread, consistent, and aggressive and appears at multiple points in consumers' interactions with the Products.

34.     All of these claims are false and misleading, as demonstrated below.

**B.      The Citric Acid in the Products Is Manufactured, Not Naturally Derived**

35.     "Citric acid as a food additive"—like that in the Products—"is not natural citric acid; it is manufactured through fermentation using *Aspergillus niger*."[20]

36.     Citric acid was first isolated in 1784, when Swedish chemist Carl Scheele derived it from lemon juice. Commercial production began in England around 1826 using Italian lemons and continued in that form until the early 20th century, "when the first industrial process using *Aspergillus niger* began in Belgium."[21] Production from lemon juice peaked in 1915–1916 at

---

[18] FACEBOOK, *available at* https://www.facebook.com/Gatorade/posts/introducing-gatorade-lower-sugar-no-artificial-flavors-sweeteners-or-colors/1459637662216544/ (last accessed May 22, 2026).

[19] *Introducing Gatorade Lower Sugar: No Artificial Flavors, Sweeteners, or Colors*, YOUTUBE, *available at* https://www.youtube.com/watch?v=iZjpjBxSHg4 (last accessed May 22, 2026).

[20] Iliana E. Sweis & Bryan C. Cressey, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, 5 TOXICOLOGY REPORTS (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6097542/.

[21] Maria Papagianni, *Advances in citric acid fermentation by Aspergillus niger: Biochemical aspects, membrane transport and modeling*, 25 BIOTECHNOLOGY ADVANCES (2007), https://www.sciencedirect.com/science/article/abs/pii/S0734975007000183.

approximately 17,500 tons.[22] Today, global production of artificial citric acid exceeds 2 million tons each year.[23]

37. Food scientist Mary Mulry, PhD, states, "We would all love to think that citric acid comes from an orange, but it does not. It comes from a chemical process."[24]

38. Although citric acid occurs naturally in citrus fruits, commercial extraction from fruit is not feasible at scale. Natural sources such as lime, lemon, and orange cannot produce the quantities demanded by the modern food and beverage industry, rendering extraction from such sources economically inefficient.[25] In 1995, the USDA wrote that citric acid in its natural form, *i.e.* as obtained "[t]raditionally by extraction from citrus juice [is] **no longer commercially available**"[26] (emphasis added). In 2015, the USDA reiterated that "[c]itric acid purified from citrus fruits is technically feasible, but whether it is economically possible is unknown."[27]

39. Microbial fermentation is the only commercially viable method of producing artificial citric acid at scale for the food and beverage industry, and it is now the dominant method of citric acid production. "About 99% of world production of citric acid occurs via microbial

---

[22] Rosaria Ciriminna et al., *Citric acid: emerging applications of key biotechnology industrial product*, 11 CHEMISTRY CENTRAL JOURNAL 1 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5342991/.

[23] Catherine Tubb, *The fermentation-led disruption of citric acid*, RETHINKX (2026), https://www.rethinkx.com/blog/citric-acid.

[24] Lisa Marshall, *Is citric acid natural?*, NEW HOPE NETWORK (Dec. 19, 2014), https://www.newhope.com/food-and-beverage/is-citric-acid-natural-.

[25] Ambreen Latif et al., *An overview of key industrial product citric acid production by Aspergillus niger and its application,* 52 *Journal of Industrial Microbiology and Biotechnology* 2 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11956825/.

[26] *Citric Acid Technical Report*, USDA AMS (1995), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf.

[27] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

processes[.]"[28] As a result, today's "citric acid is a bulk, low-value product,"[29] and to meet the "huge demand for citric acid worldwide," manufacturers are building "[m]ore and more industrial factories."[30]

40. "Industrially citric acid is currently produced by fermentation,"[31] predominantly using "a mutant strain of the black mold *Aspergillus niger*,"[32] which "account[s] for approximately 90%"[33] or "99% of the world's production of MCA."[34] (MCA, an acronym for Manufactured Citric Acid, is a term commonly used to describe artificial citric acid.) This mutant mold strain is "superior" to other microorganisms because of its high yield and easy handling.[35]

41. In this process, cheap raw materials[36] are fermented using the mutant mold *Aspergillus niger*, which biosynthesizes citric acid through microbial metabolism under tightly

---

[28] Belén Max et al., *Biotechnological production of citric acid*, 41 BRAZILIAN JOURNAL OF MICROBIOLOGY 867 (2010), https://pmc.ncbi.nlm.nih.gov/articles/PMC3769771/.

[29] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[30] Tong et al., *Whole Maize Flour and Isolated Maize Starch For Production of Citric Acid by Aspergillus Niger: A Review*, 75 STARCH – STÄRKE 1 (2023), https://onlinelibrary.wiley.com/doi/abs/10.1002/star.202000014.

[31] *Id.* at 9.

[32] Sweis & Cressey at 808.

[33] Khurshid et al., *Enhanced Citric Acid Production through Aspergillus niger: Insights from Fermentation Studies Using Sugarcane Molasses*, 14 LIFE 2 (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11204724/.

[34] Sweis & Cressey at 808.

[35] Lende et al., *Review on production of citric acid by fermentation technology*, 17 GSC BIOLOGICAL AND PHARMACEUTICAL SCIENCES 86 (2021), https://gsconlinepress.com/journals/gscbps/sites/default/files/GSCBPS-2021-0313.pdf.

[36] *Id.*

controlled industrial conditions.[37] This artificial citric acid is not extracted from citrus fruit or any other naturally occurring source, but is created during industrial fermentation as a metabolic product of the microorganism. A graphical abstract of artificial citric acid production by *Aspergillus niger* is below.



42.     Industrial fermentation using *Aspergillus niger* is carried out through two production methods: surface and submerged processes, which "exclusively" account for citric acid production.[39]

---

[37] A.R. Angumeenal & D. Venkappayya, *An overview of citric acid production*, 50 LWT - FOOD SCIENCE AND TECHNOLOGY 367 (2013), https://www.sciencedirect.com/science/article/pii/S0023643812002332.

[38] Latif et al. at 1.

[39] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

43.     In the surface process for creating artificial citric acid, sterile sugar-containing media (i.e., a nutrient mixture of sugars dissolved in water) are placed in controlled chambers and inoculated with *Aspergillus niger*, where temperature, humidity, airflow, and pH are continuously regulated. The organism forms a mycelial layer (a dense mat of fungal growth) across the surface and converts sugars into artificial citric acid over several days.[40] This process requires sterilization, environmental control, and continuous monitoring and adjustment of reaction conditions to drive production.

44.     In the submerged (or deep fermentation) process for creating artificial citric acid, the product is produced in large, aerated fermentors (industrial tanks) containing liquid broth. Inputs are sterilized and chemically adjusted, including the controlled addition and balancing of micronutrients and metals to optimize yield.[41] The system operates under carefully regulated temperature, aeration, and, at times, elevated pressure to increase oxygen transfer. Production depends on maintaining precise control over the chemical environment throughout fermentation. Submerged fermentation is the predominant commercial method used to produce artificial citric acid.[42]

45.     Artificial citric acid—through surface or submerged fermentation—is generated through a tightly controlled industrial process involving sterilization, chemical manipulation of inputs, and engineered reaction conditions—i.e., it is manufactured and not naturally derived.

---

[40] *Id.*

[41] *Citric Acid Technical Evaluation Report*, USDA AMS (2015),
https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[42] Max et al. at 869.

46. Further, "[a]t the end of fermentation, the medium contains citric acid and various undesirable by-products such as mycelium, other organic acids, mineral salts, proteins, etc."[43]

47. The product therefore must undergo further industrial processing known as "recovery and purification."[44] The recovery and purification of artificial citric acid refers to the set of industrial steps used after fermentation in an attempt to separate, purify, and isolate the artificial citric acid from the fermentation mixture so that it can be used as a commercial food ingredient. Describing recovery as part of the "[b]iotechnological production of citric acid," scientists explain:

> The first step of citric acid recovery involves the precipitation of oxalic acid, possibly in the form of calcium oxalate at low pH, and subsequent separation from the medium containing the mycelium through rotating filters or centrifuges. Citric acid is then precipitated at pH 7.2 and 70–90 °C and recovered by filtration and drying. If a purer product were desired, it is dissolved with sulfuric acid, treated with charcoal or ion exchange resins, and again crystallized as anhydrous citric acid (above 40 °C) or as a monohydrate (below 36.5 °C).[45]

---

[43] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[44] *How Citric Acid is Produced: The Process Behind This Common Food Additive?*, ELCHEMY (Dec. 24, 2024), https://elchemy.com/blogs/food-nutrition/how-citric-acid-is-produced-the-process-behind-this-common-food-additive.

[45] Max et al. at 871.



48.     A flow chart demonstrating precipitation is below:



49.     While precipitation is the most common recovery method at commercial scale due to its cost-effectiveness,[47] manufacturers of artificial citric acid also recover it through solvent extraction, which separates the artificial citric acid from fermentation liquor by transferring it into a chemical solvent phase and re-isolating it through further processing. As the FDA explains, this

_____

[46] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[47] Latif et al. at 10-11.

- 20 -

process employs a solvent mixture of n-octyl alcohol, synthetic isoparaffinic petroleum hydrocarbons, and tridodecyl amine. 21 C.F.R. § 173.280(a).

50.     Manufacturers may also recover artificial citric acid through adsorption, a process in which citric acid binds to the surface of a solid material and is later released through chemical treatment. In this method, manufacturers use ion-exchange resins and synthetic adsorbents—such as Amberlite, Diaion, and Dowex—to capture artificial citric acid and subsequently desorb it using solvents.[48]

51.     None of these processes result in any "natural" flavoring products. On the contrary, each of these recovery and purification methods—precipitation, solvent extraction, and adsorption—are industrial chemical processes that convert fermentation broth into a manufactured artificial citric acid ingredient, "a colorless, transparent or translucent crystal, or particle powder that is readily soluble in water and ethanol."[49]

52.     The manufacture of artificial citric acid involves multi-step industrial fermentation, chemical processing, and purification, rather than extraction from a naturally occurring food source. Artificial citric acid is "not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." *See* 21 C.F.R. § 101.22(a)(1). Rather, it is produced by a mutant mold and treated with a series of chemicals in a process that no reasonable consumer would ever conclude resulted in a "natural" flavoring additive.

---

[48] Latif et al at 11.

[49] Tong et al. at 1.

53. Seventy percent of all citric acid produced in this way is used as a food or beverage additive,[50] making artificial citric acid "one of the most common additives in food and beverage products across the world."[51]

54. The FDA has, through warning letters, expressly identified the presence of artificial citric acid as incompatible with "natural" labeling claims. For example, in a warning letter to Hirzel Canning Company, the FDA stated that products labeled "All Natural" were misbranded because they contained added citric acid and calcium chloride, explaining that FDA policy requires that "nothing artificial or synthetic . . . has been added to, a food that would not normally be expected to be in the food."

55. Similarly, in a warning letter to Oak Tree Farm Dairy, Inc., the FDA advised that use of the terms "100% NATURAL" and "ALL NATURAL" was inappropriate where the product "contains citric acid." In another warning letter to Chiquita, the FDA characterized artificial citric acid as a "chemical" ingredient.

56. Regulatory commentary likewise reflects ongoing recognition that artificial citric acid is distinct from the citric acid naturally occurring in citrus fruits. As a reviewer for the USDA wrote, in 1995:

> It is a natural occurring substance that commercially goes through numerous chemical processes to get to it's [sic] final usable form . . .. Unless it is actually derived from a natural source the labeling must not indicate that it is a natural compound.[52]

---

[50] Sweis & Cressey at 808.

[51] *Citric Acid Supply Chain – Full Profile*, EPA 1 (2022), https://www.epa.gov/system/files/documents/2023-03/Citric+Acid+Supply+Chain+Profile.pdf.

[52] *Citric Acid Technical Report*, USDA AMS (1995), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf.

57.     The reviewer further distinguished artificial citric acid from "natural citric acid," or citric acid isolated from "citrus juices."[53]

58.     "According to 2019 spring public comment . . . [t]wo commenters wrote that citric acid should be classified as synthetic unless it is possible to define non-synthetic citric acid by annotation."[54]

59.     Further, a 2018 study suggests that unlike natural citric acid, artificial citric acid may be associated with recurrent inflammatory or allergy-like reactions, including respiratory, gastrointestinal, and musculoskeletal symptoms in some individuals.[55] As Sweis and Cressey note, "The molecular formula of the natural citric acid obtained from lemons and limes and that of [artificial citric acid] is the same, $C_6H_8O_7$. However, the potential presence of impurities or fragments from the *Aspergillus niger* in MCA is a significant difference that may trigger deleterious effects when ingested."[56]

60.     Therefore, upon information and belief, artificial citric acid contains impurities that natural citric acid does not, providing further evidence that artificial citric acid is unnatural.

61.     Defendants sell their Products nationwide through some of the largest American retailers, including Walmart, Kroger, Costco, Albertsons Companies—the four largest U.S. supermarket operators—and other large retailers such as Amazon, Target, 7-Eleven, Price Rite,

---

[53] *Id.*

[54] *Sunset 2021*, NATIONAL ORGANIC PROGRAM 4 (2019) https://www.ams.usda.gov/sites/default/files/media/HS2021SunsetRvwFall2019.pdf.

[55] Sweis & Cressey at 808-809.

[56] *Id* at 809.

Dollar General, Wegmans, Instacart, Sam's Club, Safeway, Publix, Giant Eagle, H-E-B, and Giant Food.[57]

62.     As companies whose products are enjoyed more than one billion times a day across 200+ countries, generating nearly $92 billion in net revenue in 2024, it would be commercially infeasible for Defendants to source citric acid through any method other than microbial fermentation. Defendants therefore must necessarily use artificial citric acid to flavor the Products.

63.     Defendants manufacture and distribute the Products using uniform formulations. Maintaining consistency in taste, acidity, and shelf stability at this scale requires standardized ingredient sourcing.

64.     Moreover, Defendants do not disclose any specialty sourcing production method or other premium or atypical citric acid process for the Products. Defendants know how to make such disclosures: on Amazon, they utilized a "Special Ingredients" field and chose to populate it with "No Artificial Flavors, Sweeteners, or Colors from Artificial Sources." If Defendants chose to deviate from industry practice, presumably, they would have disclosed that fact. That is, if the Products actually contain natural citric acid derived from citrus fruits—unlike virtually every other commercial food product, which contain artificial citric acid (because traditional extraction of natural citric acid is "no longer commercially available")—one would expect Defendants to highlight that distinction.

65.     In short, given that 99% of citric acid is chemically and artificially produced through microbial fermentation, that extraction of natural citric acid from citrus fruit is no longer commercially viable, and the scale of Defendants' operations, the only plausible inference is that

---

[57] *Top U.S. Grocery Store Giants: The Biggest Supermarkets & Foot Traffic Data*, PASSBY, *available at* https://passby.com/blog/top-grocery-supermarkets-foot-traffic-data/ (last accessed May 22, 2026).

the citric acid used in the Products is artificial citric acid that is industrially manufactured through fermentation.

## C. The Products Contain Artificial Flavors Contrary to Defendants' Claims

66.    Contrary to Defendants' claims of "No Artificial Flavors" and "Naturally Flavored," the Products contain an artificial flavoring ingredient. Specifically, they incorporate artificial citric acid, a synthetically produced compound that materially shapes the flavor profile of the Products.

67.    Citric acid is widely used in the food and beverage industry, including as a flavoring agent. It imparts tartness, tanginess, and sourness—sensory attributes that constitute "flavor" under 21 C.F.R. § 101.22(a)(1) because they directly affect the taste of a finished food.

68.    "Major attractions of citric acid as a food and beverage acidulant are high solubility, extremely low toxicity, and **pleasant sour taste**"[58] (emphasis added). In the food and beverage industry, "citric acid [] provides a fruity flavor," and is otherwise used to "add sour flavor[.]"[59]

---

[58] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf, citing Karaffa & Kubicek 2003 and Kristiansen, et al. 1999.

[59] Tong et al. at 1.

69. "Citric acid can only be detected via sour taste,"[60] and scientific literature demonstrates that citric acid actively shapes overall flavor perception by interacting with sugars to balance sweetness and sourness.[61]

70. Owing to its distinct and potent taste, citric acid is routinely used to create or enhance tart, tangy, and sour flavors in food and beverage products, and therefore functions to impart flavor.

71. Citric acid is a prominent ingredient in the Products, appearing near the top of the list of ingredients. Representative ingredient lists are included below.

72. Glacier Cherry:

WATER, SUGAR, CITRIC ACID, NATURAL FLAVOR, SODIUM CITRATE, SALT, MONOPOTASSIUM PHOSPHATE, MODIFIED FOOD STARCH, PURIFIED STEVIA LEAF EXTRACT, GLYCEROL ESTER OF ROSIN.[62]

---

[60] Hannah E R Frank, The evolution of sour taste, Proceedings. 289 BIOLOGICAL SCIENCES 3 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8826303/.

[61] *See, e.g.,* Junge et al., *Suppression of sweetness: evidence for central mechanism for suppression of sweetness from sucrose by citric acid*, 48 CHEMICAL SENSES (2023), https://academic.oup.com/chemse/article/doi/10.1093/chemse/bjad036/7260297; Mao et al., *Dynamic interaction of sweet and sour taste perceptions based on sucrose and citric acid*, 9 SCIENCE OF FOOD (2025), https://www.nature.com/articles/s41538-025-00507-7; Veldhuizen et al., *Interactions of Lemon, Sucrose and Citric Acid in Enhancing Citrus, Sweet and Sour Flavors*, 43 CHEMICAL SENSES (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5863559/.

[62] *Gatorade Lower Sugar Glacier Cherry*, GATORADE, *available at* https://www.gatorade.com/sports-drinks/gatorade-lower-sugar/glacier-cherry (last accessed May 22, 2026).

73. Rain Berry:

WATER, SUGAR, CITRIC ACID, SODIUM CITRATE, SALT, NATURAL FLAVOR, MONOPOTASSIUM PHOSPHATE, PURIFIED STEVIA LEAF EXTRACT, VEGETABLE JUICE (COLOR), MODIFIED FOOD STARCH, GLYCEROL ESTER OF ROSIN. [63]

74. Lemonade:

WATER, SUGAR, CITRIC ACID, SODIUM CITRATE, SALT, MONOPOTASSIUM PHOSPHATE, GUM ARABIC, PURIFIED STEVIA LEAF EXTRACT, NATURAL FLAVOR, GLYCEROL ESTER OF ROSIN, SUCROSE ACETATE ISOBUTYRATE. [64]

---

[63] *Gatorade Lower Sugar Rain Berry*, GATORADE, *available at* https://www.gatorade.com/sports-drinks/gatorade-lower-sugar/rain-berry (last accessed May 22, 2026).

[64] *Gatorade Lower Sugar Lemonade*, GATORADE, *available at* https://www.gatorade.com/sports-drinks/gatorade-lower-sugar/lemonade (last accessed May 22, 2026).

75.     Fruit Punch:

WATER, SUGAR, CITRIC ACID, SODIUM CITRATE, SALT, MONOPOTASSIUM PHOSPHATE, PURIFIED STEVIA LEAF EXTRACT, MODIFIED FOOD STARCH, VEGETABLE JUICE (COLOR), NATURAL FLAVOR, GLYCEROL ESTER OF ROSIN. [65]

76.     In all of the Products listed above, citric acid appears as the third-most present ingredient and always precedes "Natural Flavor." Its repeated prominence across the Products demonstrates that citric acid contributes materially to their taste and flavor system.

77.     Moreover, each flavor depends on the interplay of sweetness and tartness—cherry for Glacier Cherry, blackberry for Rain Berry, lemon for Lemonade, orange and grapefruit for Fruit Punch. Citric acid supplies the tartness that makes each fruit flavor recognizable as the fruit it purports to be.

78.     If citric acid were removed or substantially reduced, the taste of the Products would be materially altered. Citric acid supplies the tart and sour flavor central to the Products and necessarily functions "to impart flavor" to the Products.

79.     The Products also contain sodium citrate, an artificial ingredient that imparts tart flavor to the Product.

---

[65] *Gatorade Lower Sugar Fruit Punch*, GATORADE, *available at* https://www.gatorade.com/sports-drinks/gatorade-lower-sugar/fruit-punch (last accessed May 22, 2026).

80.     Sodium citrate "function[s] as . . . [a] flavoring agent[]." But it is not natural. Rather, it is an artificial flavor "produced by chemical reaction with citric acid and the hydroxide or carbonate,"[66] and is a nonagricultural, synthetic substance. 7 C.F.R. § 205.605(b).

81.     Sodium citrate is "prepared by neutralizing citric acid with sodium hydroxide or sodium carbonate[.]"[67] "Sodium citrate is chemically produced[.]"[68] Like citric acid, sodium citrate has "a sour taste"[69] and, by design, contributes to the sour flavor profile of these Products. As the USDA explains:

> Sodium citrate is chiefly used as a food additive, usually for flavoring or as a preservative. Sodium citrate gives club soda both its sour and salty flavors. It is common in lemon-lime soft drinks, and it is partly what causes them to have their sour taste.[70]

82.     In combination with citric acid, sodium citrate supplies the tartness, balance, and palatability that define the Products' taste. Labeling the Products as free from artificial flavors, or implying that their taste is naturally derived, is false and misleading.

---

[66] *Technical Evaluation Report, Citric Acid*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[67] *See* 21 C.F.R. § 184.1751(a).

[68] *Technical Evaluation Report, Sodium Citrate*, USDA AMS (2017), https://www.ams.usda.gov/sites/default/files/media/SodiumCitrateCropsTR20171218.pdf.

[69] *Trisodium citrate*, PUBCHEM, *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Sodium-Citrate (last accessed Apr. 6, 2026).

[70] *Citric Acid Technical Evaluation Report*, USDA AMS (2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

**D.      These Misrepresentations Are Material to Consumers**

83.     "The significance of naturalness has crucial meaning for consumers nowadays. They prefer food free from preservatives, additives or artificial ingredients for perceived naturalness of foods."[71]

84.     Consumers increasingly seek out products marketed as natural. A 2024 consumer study found that 81 percent of shoppers consider it important to purchase "clean label" products— those with as "few ingredients as possible, easy-to-recognize ingredients, and no artificial ingredients or synthetic chemicals."[72]

85.     And "54% of US consumers . . . say the most important aspects of clean label products are no artificial ingredients, clear and understandable labels, and honest information with no misleading claims."[73]

86.     Another survey in 2026 found that consumers "are worried about health risks from artificial ingredients, chemicals, and/or preservatives in foods[.]"[74]

87.     Consumers commonly understand "citric acid" to be derived from citrus fruits, and express surprise and concern upon learning that commercially used citric acid is instead produced through microbial fermentation. Public commentary reflects this widespread misunderstanding.

---

[71] Guzik et al., *Consumer Attitudes towards Food Preservation Methods*, 11 Foods 7 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9099755/pdf/foods-11-01349.pdf.

[72] *Clean Label Products Driving Retail Sales as They Gain Preference Among Consumers,* Acosta Group (2024), https://www.acosta.group/clean-label-products-driving-retail-sales-as-they-gain-preference-among-consumers/.

[73] *Demonized Ingredients: Discovering Hidden Opportunities in the US*, Innova Market Insights (2025), https://www.innovamarketinsights.com/trends/demonized-ingredients-in-the-us/.

[74] *Half of U.S. Shoppers Worried About Artificial Ingredients*, Acosta Group (2026), https://www.acosta.group/half-of-u-s-shoppers-worried-about-artificial-ingredients/.

For example, in response to a video discussing citric acid produced using *Aspergillus niger*, users commented:

> "I watch[ed] a video and talked about how they purified it with sulfuric acid...like that makes it sound even worse! They put tons of chemicals in to purify it. And then there you go it is on your plate . . . yuck!"

> "I didn't know that! Legit thought it was citrus"

> "I'm allergic to Aspergillus niger and had no idea it was citric acid."[75]

88. Public commentary further reflects that, when informed of how citric acid is manufactured, consumers recognize it as artificial and understand that such disclosure would affect their perception of the product. For example, one consumer stated that "even calling it artificial citric acid would make a huge difference."[76]

89. Statements like "No Artificial Flavors" and "Naturally Flavored" strongly influence purchasing decisions, steering these consumers to choose and pay more for products that prominently make clean label claims over those that do not.

90. Defendants' "No Artificial Flavors" and "Naturally Flavored" statements are part of a deliberate marketing strategy designed to capitalize on this demand. Defendants know that consumers place a premium on products free of artificial flavors and that such claims materially increase marketability and sales. But those statements are false and misleading.

---

[75] *Citric acid = black mold (Aspergillus niger)*, FACEBOOK, *available at* https://www.facebook.com/watch/?v=1261599071830798 (last accessed Apr. 6, 2026).

[76] *Manufactured citric acid*, REDDIT, *available at* https://www.reddit.com/r/migraine/comments/1pqsp8k/manufactured_citric_acid/ (last accessed Apr. 6, 2026).

91. As alleged above, Defendants flavor the Products with artificial citric acid and sodium citrate. Neither of these chemicals is derived from any natural source; nor do they comport with reasonable consumers' expectations for a product labeled as having no artificial flavors.

92. Consumers who sought to avoid artificial flavors reasonably relied on Defendants' representations and did not receive the natural, wholesome product they believed they were purchasing. Defendants, meanwhile, obtained an unfair competitive advantage and extracted a price premium based on these deceptive and material misrepresentations.

93. Defendants charge a premium for the Products, and that premium is tied directly to their "No Artificial Flavors" and "Naturally Flavored" marketing. By falsely presenting the Products as free of artificial flavors, Defendants positioned them as superior to any competing products that truthfully disclose artificiality.

94. Defendants' conduct misleads reasonable consumers, distorts competition, and, ultimately, results in economic harm. Consumers paid more than they otherwise would have for a product that was not what it claimed to be. This widespread deception has not only caused financial harm to consumers but works to erode trust in the truth of product labeling and marketing.

## CLASS ACTION ALLEGATIONS

95. Plaintiff brings this action on behalf of themself and on behalf of the following proposed Nationwide Class, initially defined as follows:

> All individuals in the United States who purchased a Product within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

96. Plaintiff also brings this action on behalf of themself and on behalf of the following proposed Multi-State Consumer Protection Subclass, initially defined as follows:

> All individuals in the States of Alaska, Arkansas, California, Connecticut, Delaware, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Michigan, Missouri, New Jersey, New

York, Rhode Island, Vermont, and Washington who purchased a Product within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

97.     Plaintiff also brings this action on behalf of themself and on behalf of the following proposed California Subclass, initially defined as follows:

All individuals in California who purchased a Product within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

98.     Excluded from the proposed Classes are Defendants and their parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendants have a controlling interest.

99.     Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

100.    The claims of all Class members derive directly from a single course of conduct by Defendants. Defendants have engaged and continue to engage in uniform and standardized conduct toward the putative Class members. Defendants do not differentiate, in degree of care or candor, in their actions or inactions, or the content of their statements or omissions, among individual Class members.

101.    Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

102.    Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

103. Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

104. **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are each so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed each Class includes many tens of thousands of members. The precise number of Class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Defendants' records.

105. **Ascertainability.** The Class is ascertainable because its members can be readily identified using business records, and other information kept by Defendants in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

106. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all Class members. These questions predominate over the questions affecting only individual Class members. The common legal and factual questions include, without limitation:

(a) Whether Defendants' marketing claims about the Product are misleading to a reasonable consumer;

(b) Whether Defendants engaged in the conduct alleged in this Complaint;

(c) Whether Defendants violated the applicable statutes alleged herein;

(d) Whether Plaintiff and the Class members are injured and harmed directly by Defendants' conduct;

(e) Whether Plaintiff and the Class members are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts;

(f) Whether Plaintiff and the Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint;

(g) Whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

(h) Whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(i) Whether Plaintiff and the Classes are entitled to civil penalties; and

(j) Whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

107. **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of Plaintiff and the putative Class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendants, resulting in the same injury to Plaintiff and the putative Class members. Plaintiff and all Class members are similarly affected by Defendants' wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

108. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiff is an adequate representative of the Classes because their interests do not conflict with the interests of the Class members, and they have retained competent and experienced class counsel. Plaintiff and their counsel will fairly and adequately protect the interest of the Class members.

109. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class

members. There is no special interest in Class members individually controlling the prosecution of separate actions. The damages suffered by individual Class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. And, even if Class members themselves could afford such individual litigation, the court system could not, given the tens or even hundreds of thousands of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

110. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendants; or

(b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CAUSE OF ACTION

**Violations of Consumers Legal Remedies Act (the "CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of Plaintiff Darr and the California Subclass)**

111.  Plaintiff Darr incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

112.  Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

113.  Plaintiff and other California Subclass members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

114.  The Products that Plaintiff (and other similarly situated California Subclass members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

115.  By engaging in the actions, representations, and conduct set forth in the Complaint, Defendants have violated, and continue to violate §§ 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA.

116.  In violation of § 1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have.

117. In violation of § 1770(a)(7), Defendants' acts, practices, and omissions constitute improper representations that the goods its sell are of a particular standard, quality, or grade, when they are of another.

118. In violation of § 1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised.

119. Defendants' acts, practices, and omissions, set forth above, led consumers to falsely believe that the Products are free from artificial flavors.

120. In reality, the Products contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

121. Plaintiff reasonably relied on Defendants' representations and omissions. The representations and omissions were material because a reasonable consumer would consider whether the Products contain artificial flavors as an important factor in deciding whether to purchase the Products. The representations and omissions were a substantial factor in Plaintiff's decision to purchase the Products.

122. Defendants' violations of the CLRA directly and proximately caused injury in fact and damages to Plaintiff and the California Subclass. Absent Defendants' misrepresentations and omissions, Plaintiff would not have purchased the Products or would have paid substantially less for them.

123. Plaintiff and the California Subclass have no adequate remedy at law.

124. Plaintiff seeks relief for violations of the CLRA in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate and make whole Plaintiff and the California Subclass. Restitution is appropriate because it is more certain, prompt, and efficient as compared

- 38 -

to damages. Further, to obtain a full refund as damages, Plaintiff would have to show that the Products have no market value, whereas that showing is not required for restitution.

125.    Plaintiff also seeks injunctive relief in the form of an order enjoining Defendants from continuing to deceptively market the Products. Injunctive relief is appropriate because Defendants continue to deceptively market the Products as containing "No Artificial Flavors" and being "Naturally Flavored," when they contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

126.    Injunctive relief is therefore necessary to prevent Defendants from continuing to engage in the unlawful conduct—and to prevent future harm to Plaintiff and the California Subclass, which cannot be achieved through available legal remedies.

## SECOND CAUSE OF ACTION

**Violations of California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Darr and the California Subclass)**

127.    Plaintiff Darr incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

128.    California Business & Professions Code, sections 17200, *et seq.* (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

129.    Defendants' false and misleading advertising claims regarding the Products violate all three prongs—unlawful, unfair, and fraudulent—of the UCL.

130.    First, Defendants' representations and omissions regarding the Products are unlawful because they are misleading to a reasonable consumer and violate the CLRA, FAL, and NY GBL, as alleged herein.

- 39 -

131. Second, Defendants' conduct violates the "unfair" prong of the UCL because Defendants' representations and omissions regarding the Products are illegal, immoral, unscrupulous, and substantially injurious to consumers, and the negative impact on consumers outweighs any reasons, justifications, or motives for Defendants' conduct.

132. Third, Defendants' conduct violates the "fraudulent" prong of the UCL because Defendants' representations and omissions are likely to deceive members of the public.

133. Plaintiff reasonably relied on Defendants' representations and omissions. The representations and omissions were material because a reasonable consumer would consider whether the Products contain artificial flavors as an important factor in deciding whether to purchase them. The representations and omissions were a substantial factor in Plaintiff's decision to purchase the Products.

134. As a direct and proximate result of Defendants' violations of the UCL, Plaintiff and the California Subclass have suffered injury in fact and have lost money. Plaintiff and the California Subclass paid an unwarranted premium for the Products and/or were denied the benefit of the bargain.

135. Absent Defendants' misrepresentations and omissions, Plaintiff would not have purchased the Products or would have paid substantially less for them.

136. Plaintiff and the California Subclass have no adequate remedy at law.

137. Plaintiff seeks relief for violations of the UCL in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole Plaintiff and the California Subclass. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages. Further, to obtain a full refund as damages, Plaintiff would have to show that the Products have no market value, whereas that showing is not required for restitution.

- 40 -

138.    Plaintiff also seeks injunctive relief in the form of an order enjoining Defendants from continuing to deceptively market the Products. Injunctive relief is appropriate because Defendants continue to deceptively market the Products as containing "No Artificial Flavors" and being "Naturally Flavored," when they contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

139.    Plaintiff would like to purchase the Products from Defendants in the future if they could have confidence regarding the truth of Defendants' marketing claims, but in the absence of injunctive relief they will be left to guess whether the claims are accurate. Injunctive relief is therefore necessary to prevent Defendants from continuing to engage in the unlawful conduct and to prevent future harm to Plaintiff and the California Subclass, which cannot be achieved through available legal remedies.

## THIRD CAUSE OF ACTION

### Violations of California False Advertising Law ("FAL")
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*
### (On Behalf of Plaintiff Darr and the California Subclass)

140.    Plaintiff Darr incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

141.    The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

142.    The FAL prohibits not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public.

143.    Defendants violated section 17500 when they advertised and marketed the Products through the unfair, deceptive, and misleading representations and omissions disseminated to the

public that the Products were free from artificial flavors. In reality, the Products contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

144. Plaintiff reasonably relied on Defendants' representations and omissions. The representations and omissions were material because a reasonable consumer would consider whether the Products contain artificial flavors as an important factor in deciding whether to purchase them. The representations and omissions were a substantial factor in Plaintiff's decision to purchase the Products.

145. As a direct and proximate result of Defendants' violations of the FAL, Plaintiff and the California Subclass have suffered injury in fact and have lost money. Plaintiff and the California Subclass paid an unwarranted premium for the Products and/or were denied the benefit of the bargain.

146. Absent Defendants' misrepresentations and omissions, Plaintiff would not have purchased the Products or would have paid substantially less for them.

147. Plaintiff and the California Subclass have no adequate remedy at law.

148. Plaintiff seeks relief for violations of the FAL in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole Plaintiff and the California Subclass. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages. Further, to obtain a full refund as damages, Plaintiff would have to show that the Products have no market value, whereas that showing is not required for restitution.

149. Plaintiff also seeks injunctive relief in the form of an order enjoining Defendants from continuing to deceptively market the Products. Injunctive relief is appropriate because Defendants continue to deceptively market the Products as containing "No Artificial Flavors" and

being "Naturally Flavored," when they contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

150.    Injunctive relief is therefore necessary to prevent Defendants from continuing to engage in the unlawful conduct and to prevent future harm to Plaintiff and the California Subclass, which cannot be achieved through available legal remedies.

**FOURTH CAUSE OF ACTION**

**State Consumer Protection Statutes**
**(On Behalf of Plaintiff and the Multi-State Consumer Protection Subclass)**

151.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

152.    The consumer protection statutes of the states in the Multi-State Consumer Protection Subclass prohibit unfair, deceptive, or misleading acts or practices in the conduct of trade or commerce. The specific statutes at issue include:

a.    Alaska (Alaska Stat. § 45.50.471, *et seq.*);

b.    Arkansas (Ark. Code Ann. § 4-88-101, *et seq.*);

c.    California (Civil Code §§ 1750, 17200, 17500, *et seq.*);

d.    Connecticut (Conn. Gen. Stat. § 42-110a, *et seq.*);

e.    Delaware (Del. Code Ann. tit. 6, § 2511, *et seq.*);

f.    District of Columbia (D.C. Code § 28- 3901, *et seq.*);

g.    Florida (Fla. Stat. § 501.201, *et seq.*);

h.    Hawaii (Hawaii Rev. Stat. § 480-1, *et seq.*);

i.    Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*);

j.    Massachusetts (Mass. Gen. Laws Ch. 93A § 1, *et seq.*);

k.    Michigan (Mich. Comp. Laws § 445.901, *et seq.*);

- 43 -

l.   Missouri (Mo. Rev. Stat. § 407.010, *et seq.*);

m.  New Jersey (N.J. Stat. § 56:8-1, *et seq.*);

n.  New York (GBL §§ 349 & 350);

o.  Rhode Island (R.I. Gen. Laws § 6-13.1-1, *et seq.*);

p.  Vermont (Vt. Stat. Ann. tit. 9, § 2451, *et seq.*); and

q.  Washington (Wash. Rev. Code § 19.86.010, *et seq.*)

153.    Plaintiff and the Multi-State Consumer Protection Subclass have standing to pursue claims under these statutes because they suffered injury in fact and lost money as a result of Defendants' conduct.

154.    Defendants engaged in unfair and/or deceptive conduct by making material misrepresentations and omissions regarding the Products, including representing that the Products contain "No Artificial Flavors" and are "Naturally Flavored," when in fact they contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

155.    Defendants' misrepresentations and omissions were material and likely to deceive reasonable consumers. A reasonable consumer would consider whether a product contains artificial flavors to be an important factor in deciding whether to purchase the Product.

156.    Plaintiff and the Multi-State Consumer Protection Subclass reasonably relied on Defendants' representations and omissions. These representations and omissions were a substantial factor in their decisions to purchase the Products. Absent Defendants' misrepresentations and omissions, Plaintiff and members of the Multi-State Consumer Protection Subclass would not have purchased the Products or would have paid substantially less for them.

157. As a direct and proximate result of Defendants' deceptive conduct, Plaintiff and the Multi-State Consumer Protection Subclass suffered injury in fact and lost money. They paid a price premium for the Products and/or did not receive the benefit of their bargain.

158. Plaintiff and the Multi-State Consumer Protection Subclass have been injured by Defendants' deceptive acts or practice, suffering an ascertainable loss by paying more for a product than they otherwise would have but for the false advertising.

159. Plaintiff and the Multi-State Consumer Protection Subclass have no adequate remedy at law.

160. Defendants' conduct has caused and continues to cause immediate and irreparable injury to Plaintiff and the Multi-State Consumer Protection Subclass and will continue to mislead consumers unless enjoined by this Court.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment
### (On Behalf of Plaintiff and All Classes)

161. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

162. Plaintiff and members of the Class conferred a tangible economic benefit on Defendants in the form of monetary payments for Products, which were purchased based on Defendants' representations regarding the lack of artificial flavors.

163. Defendants knowingly accepted and retained these financial benefits under circumstances that make such retention unjust. Defendants marketed and sold the Products as containing "No Artificial Flavors" and being "Naturally Flavored," claims that were false, misleading, and not substantiated by the actual composition of the Products.

164. Plaintiff and members of the Class did not receive the full value of what they paid for. Had they known the truth, Plaintiff and members of the proposed Classes would not have purchased the Products or would have paid significantly less.

165. It would be inequitable for Defendants to retain the profits from the sale of these deceptively marketed Products, as the enrichment was obtained through false and misleading labeling and marketing, omissions of material fact, and a campaign designed to create the false impression that the Products were free from artificial flavors.

166. Plaintiff and Class members have no adequate remedy at law.

167. Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the Class members and will continue to both damage Plaintiff and the Class members and deceive the public unless enjoined by this Court.

## SIXTH CAUSE OF ACTION

### Fraud
### (On Behalf of Plaintiff and All Classes)

168. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

169. Defendants made material misrepresentations and omissions regarding the Products, including representing that the Products contain "No Artificial Flavors" and are "Naturally Flavored," when in fact they contain manufactured citric acid and sodium citrate, artificial additives that impart flavor.

170. These representations and omissions were false and misleading when made, and Defendants knew or recklessly disregarded that they were false and misleading.

171. Defendants made these misrepresentations and omissions with the intent to induce Plaintiff and Class members to purchase the Products.

172. Plaintiff and Class members reasonably relied on Defendants' misrepresentations and omissions. These misrepresentations and omissions were material and were a substantial factor in Plaintiff's and Class members' decisions to purchase the Products.

173. Plaintiff and Class members have no adequate remedy at law.

174. Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the Class members and will continue to both damage Plaintiff and the Class members and deceive the public unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themself and the proposed Classes, pray for relief and judgment against Defendants as follows:

A. certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as Class Counsel;

B. awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C. awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D. awarding Plaintiff and the Classes exemplary and punitive damages;

E. awarding Plaintiff and the Classes civil penalties;

F. granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G. enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

H.       awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I.       awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J.       awarding pre-judgment and post-judgment interest; and

K.       granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 22, 2026                    Respectfully submitted,

                                       */s/ Raphael Janove*
                                       Raphael Janove (IL Bar No. 6328523)
                                       **JANOVE PLLC**
                                       115 Broadway, 5th Fl.
                                       New York, NY 10006
                                       (646) 347-3940
                                       raphael@janove.law

- 48 -